# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHAD LANGLOIS, | ) |
| Plaintiff, | ) |
| | ) Civil Action No. |
| v. | ) 16-12109-FDS |
| MANUEL PACHECO, THOMAS HODGSON, GLEN TABER, and NICHOLAS DRINKWINE, | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is a civil rights action under 42 U.S.C. § 1983 arising out of an attack against plaintiff Chad Langlois, then an inmate at the Bristol County House of Corrections, by his cellmate, Manuel Pacheco. The complaint alleges that the Sheriff of Bristol County, Thomas Hodgson, and two corrections officers, Nicholas Drinkwine and Glen Taber, acted with deliberate indifference and disregard for Langlois's health and safety. Specifically, the complaint alleges that defendants failed to protect Langlois from imminent attack and harm by moving either Langlois or Pacheco to a different cell or by searching Pacheco for a weapon.

Defendants Hodgson, Drinkwine, and Taber have moved for summary judgment. For the following reasons, the motion will be granted.

# I. Background

Except where otherwise noted, the following facts are set forth in the record and are undisputed.

## A. Factual Background

Between February 21, 2013, and February 14, 2014, Chad Langlois was an inmate at the Bristol County House of Correction ("BCHOC"). (Ds' SUMF ¶ 1; Dirks Aff. Ex. 1 at 10; Ex. 2). While incarcerated at the BCHOC, he acted as a confidential informant for the Special Investigations Unit. (Ds' SUMF ¶ 2; Dirks Aff. Ex. 1 at 54–55). On February 14, 2014, he was transferred from the BCHOC to the custody of the Massachusetts Department of Correction. (Ds' SUMF ¶ 3; Dirks Aff. Ex. 1 at 10–11; Ex. 2). Between February 14, 2014, and December 28, 2016, he was continuously incarcerated at DOC facilities. (Ds' SUMF ¶ 4; Dirks Aff. Ex. 1 at 10–11).

The Bristol County Sheriff's Office operates the House of Corrections. Thomas Hodgson is the Sheriff of Bristol County. (Ds' SUMF ¶ 6; Dirks Aff. Ex. 3 at No. 2). Corrections officers Glen Taber and Nicholas Drinkwine were employed as sergeants in the BCHOC Special Investigations Unit in 2013. (Ds' SUMF ¶¶ 7–8; Dirks Aff. Ex. 4 at No. 2; Ex. 5 at No. 2; Drinkwine Aff. ¶ 1). Following the birth of his son, Drinkwine left for parental leave on October 11, 2013, and did not return until at least November 4, 2013. (Ds' SUMF ¶ 31; Dirks Aff. Ex. 9; Drinkwine Aff. ¶ 8).

On October 3, 2013, Langlois was transferred to the disciplinary unit at the BCHOC after a report that he made disrespectful comments to a nurse. (Ds' SUMF ¶¶ 9–11; Dirks Aff. Ex. 1 at 46–50; Ex. 2). Manuel Pacheco was assigned to be his cellmate. (Ds' SUMF ¶ 12; Dirks Aff. Ex. 1 at 21–22). In the week prior to the assault, Langlois wrote a letter to Steven Sousa, the

Superintendent of BCHOC, requesting help resolving his disciplinary issue in exchange for continuing to act as an informant. (Pl.'s SMF ¶ 6; Dirks Aff. Ex. 1 at 69–71, 138–139; Pavlos Aff. Ex. 5). The letter stated that Langlois had information about knives in the unit and requested a meeting with Taber. He did not, however, mention Pacheco or any specific threat. (Dirks Aff. Ex. 7).

Langlois testified that he sent the same letter to Taber. (Pl.'s SMF ¶ 6; Dirks Aff. Ex. 1 at 69–71, 138–139; Pavlos Aff. Ex. 5). He further testified that Taber met with him personally after receiving the letter, and that he told Taber during that meeting that he was scared of Pacheco. (Pl.'s SMF ¶ 6; Dirks Aff. Ex. 1 at 76–78, 83–84).

On October 15 and October 17, 2013, Langlois filed two grievances, one about a canteen issue and one about his disciplinary matter. (Ds' SUMF ¶¶ 61–62; Dirks Aff. Exs. 12 & 13). Neither grievance mentioned Pacheco, a weapon, or any threat to his safety. (*Id.*)

Langlois testified that on October 19, 2013, he met with Taber again, and told him that he knew his cellmate had a knife. (Pl.'s SMF ¶¶ 7–8; Dirks Aff. Ex. 1 at 81, 84).

On October 21, 2013, Pacheco attacked Langlois while he was asleep, repeatedly stabbing him with a shank. (Ds' SUMF ¶ 44; Dirks Aff. Ex. 1 at 103; Pl.'s SMF ¶ 9; Pavlos Aff. Ex. 7 at No. 3). He was taken to Saint Luke's Hospital in New Bedford, where his injuries were treated. (Ds' SUMF ¶¶ 46–47; Dirks Aff. Ex. 1 at 104–06). He suffered numerous lacerations and blood loss as a result of the attack, and contends that he subsequently has suffered head trauma, nerve damage, PTSD, panic attacks, headaches, and loss of sleep. (Pl.'s SMF ¶ 15; Dirks Aff. Ex. 1 at 117; Pavlos Aff. Ex. 2 at No. 13).[1]

---

[1] Defendants dispute the extent of his injuries. (Ds' Responses to Pl.'s SMF ¶ 15 (citing Dirks Aff. Ex. 1 at 117)).

On October 31, 2013, Langlois filed a grievance about the loss of items of personal property that went missing during his October 21, 2013 hospitalization. (Ds' SUMF ¶ 63; Dirks Aff. Ex. 1 at 115–16; Ex. 14).

Langlois did not file a grievance concerning Pacheco, any risk that defendants failed to address, the injuries he sustained from the assault, or the fact that the assault occurred. (Ds' SUMF ¶ 65). Although he was familiar with the grievance procedures, he did not think he could grieve defendants' failure to protect him from Pacheco or the fact of the assault itself. (Pl.'s SMF ¶¶ 13–14; Dirks Aff. Ex. 1 at 116).

### B. Procedural Background

On October 21, 2016, Langlois filed the present action against Pacheco, Hodgson, Taber, and unidentified employees of the Bristol County Sheriff's Department.

On February 8, 2017, Hodgson, Taber, and Drinkwine moved to dismiss the claims against them for failure to state a claim or, in the alternative, for a more definite statement concerning exhaustion under the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a). On March 10, 2017, the unidentified employees also filed a motion to dismiss the claims against them for failure to state a claim.[2]

On June 19, 2017, the Court granted the motion to dismiss in part. The Court dismissed the claims against defendants in their official capacities, the claims against the unidentified employees, and three of the five claims against defendants in their individual capacities. Defendants have moved for summary judgment on the two remaining claims: failure to protect under Section 1983 (Count One) and intentional infliction of emotional distress (Count Six).

---

[2] Langlois did not file an opposition to that motion.

4

## II. <u>Standard of Review</u>

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (internal quotation marks omitted). Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Essentially, Rule 56[] mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In making that determination, the court must view "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotations omitted). The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256–57.

## III. <u>Analysis</u>

Defendants have moved for summary judgment on grounds of failure to exhaust administrative remedies and qualified immunity. Defendants further contend that they are entitled to judgment as a matter of law on the §1983 and IIED claims because none of the defendants had any knowledge of a risk to the safety of Langlois prior to the attack.

A.     **The PLRA Exhaustion Requirement**

Defendants first contend that all claims must be dismissed because Langlois failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act, 42 U.S.C. §1997e, and state law, Mass. Gen. Laws Ch. 127, §§ 38E, 38F, 103 Code Mass. Reg. 934.02.

The PLRA requires prisoners to exhaust all available administrative remedies before filing suit under § 1983 or any other federal law. 42 U.S.C. § 1997e(a). This limitation on the ability of prisoners to sue "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). To satisfy the exhaustion requirement, "prisoners must 'complete the administrative review process in accordance with the applicable procedural rules,'. . .—rules that are defined not by the PLRA, but by the prison grievance process itself." *Jones v. Bock*, 549 U.S. 199, 218 (2007) (quoting *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). A plaintiff's failure to exhaust administrative remedies is an affirmative defense as to which a defendant bears the burden of proof. *Id.* at 216.

As an initial matter, the PLRA applies only to those who file an action while they are "prisoners," as that term is defined in the statute. *Greig v. Goord*, 169 F.3d 165, 167 (2d Cir. 1999) ("[L]itigants . . . who file prison condition actions after release from confinement are no longer 'prisoners' for purposes of § 1997e(a) and, therefore, need not satisfy the exhaustion requirements of this provision."). The PLRA defines "prisoner" as "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h). *See Page v. Torrey*, 201 F.3d 1136, 1139 (9th Cir. 2000) ("[O]nly individuals who, at the time they seek to file their civil actions, are detained

6

as a result of being accused of, convicted of, or sentenced for criminal offenses are 'prisoners' within the definition of 42 U.S.C. § 1997e . . . .").

Defendants first raised the exhaustion argument at the dismissal stage in their motion for a more definite statement. From the record before the Court at that time, it appeared that Langlois had been released from incarceration in 2014. Based on the fact that he was not a prisoner at the time he filed his complaint in October 2016, the Court concluded he was not subject to the restrictions of the PLRA. *See Tomassini v. Corr. Health Servs.*, 2012 WL 1601528, at *2 (D.P.R. May 7, 2012) ("The PLRA's administrative exhaustion requirement is a precondition to suit; therefore, whether it applies depends on the plaintiff's status at the time of filing the [] complaint."). In their motion for summary judgment, however, defendants have offered evidence that between February 14, 2014, and December 28, 2016, Langlois was continuously incarcerated at DOC facilities. (Ds' SUMF ¶ 4; Dirks Aff. Ex. 1 at 10–11). Because the evidence now shows that Langlois was a prisoner at the time the complaint was filed, the complaint is subject to the restrictions of the PLRA.

The question, then, is whether Langlois complied with the PLRA's exhaustion requirement. The PLRA "uses the term 'exhausted' to mean what the term means in administrative law, where exhaustion means proper exhaustion." *Woodford*, 548 U.S. at 93. Requiring proper exhaustion in administrative proceedings "serves the twin purposes of protecting administrative agency authority and promoting judicial efficiency." *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992). To that end, the PLRA requires that an inmate, prior to initiating a lawsuit in court, exhaust all "available" remedies, not just those that meet federal standards or that provide the same type of relief that the plaintiff seeks in court. *Woodford*, 548 U.S. at 85. Requirements set by state law and regulations "define the boundaries of proper

exhaustion." *Jones*, 549 U.S. at 218. Moreover, the need to comply with those administrative requirements extends to "an agency's deadlines and other critical procedural rules." *Woodford*, 548 U.S. at 90–91.

The administrative remedies available to Langlois at the time of the assault are laid out in the BCHOC inmate grievance policy, which is provided to all inmates. (Ds' SUMF ¶ 50–57; Dirks Aff. Ex. 1 at 41–42; Ex. 10; Ex. 11 at BCSO000425–27; Souza Aff. ¶ 2). The policy applies to grievance issues, which are defined as "incidents, conditions of confinement, or application(s) [of] a facility policy, rule or regulation for which redress is sought." (Dirks Aff. Ex. 10 at BCSO000364). The inmate can report a grievance issue by submitting a grievance form within ten working days of the occurrence of the actual incident, problem, or complaint. (*Id.* at BCSO000373).

Langlois has failed to show that he filed a grievance about the threat posed by Pacheco, defendants' failure to protect him, or the assault itself, as required by the policy. He nevertheless contends that there is a genuine issue of material fact as to whether his claims were in fact subject to an administrative remedy. Specifically, he contends that his claims fall into two categories of grievance exclusions that are exempt from the policy: "[s]ecurity issues" and "[e]rrors or failures of staff to timely respond to inmate concerns or complaints within the timelines established by this policy and procedure alone." (Pl.'s SMF ¶¶ 10–12; Dirks Aff. Ex. 10 at BCSO000372). Langlois testified that he did not know he could file a grievance based on the fact that he was assaulted or against defendants for failing to protect him. (Pl.'s SMF ¶¶ 13–14; Dirks Aff. Ex. 1 at 116).

Defendants contend these two exclusions are inapposite and do not apply to the issues raised in the complaint. They specifically point to four categories of grievance issues into which

8

the complaint would fall: personal injury claims, allegations of assault by inmates or staff, staff behavior, and civil rights claims. (Dirks Aff. Ex. 10 at BCSO000371). They also point to language in the grievance policy that specifically allows for emergency grievances in situations where an inmate is facing an immediate threat to his safety or welfare. (*Id.* at BCSO000377).

At first glance, determining whether the complaint would have been exempted from the grievance procedure would seem to require a factual inquiry—for example, into whether similar complaints have been successfully grieved in the past by other prisoners. Defendants, however, contend that that such an inquiry is foreclosed by the Supreme Court's decision in *Ross v. Blake*, 136 S. Ct. 1850 (2016). In *Ross*, the Court rejected the Fourth Circuit's use of a "special circumstances" exception to PRLA exhaustion, originally formulated by the Second Circuit, in which a reviewing court could find that a prisoner's failure to comply with available administrative procedural requirements was justified. *Id.* at 1856–58. It is true that the Court rejected the judge-made exception and reiterated the mandatory nature of the PRLA exhaustion regime. *Id.* at 1858 ("Exhaustion is no longer left to the discretion of the district court." (quoting *Woodford*, 548 U.S. at 85)). But it is equally true that the Court emphasized the textual exception built into §1997e—that exhaustion requires administrative procedures be "available" to the prisoner. *Id.* at 1858.

The Court went on to describe "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief," and therefore not "available." *Id.* at 1859. First, an administrative remedy is unavailable when it "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use," such that "no ordinary prisoner can discern or navigate

9

it." *Id.* Third, prison officials might "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

Langlois has not offered any affirmative evidence to suggest that any of *Blake*'s three exceptions would apply. The grievance procedures, a copy of which is provided to each inmate and with which Langlois testified he was familiar, are not particularly opaque. He successfully filed three grievances in the month of October 2013, alone, including one following the assault, in which he grieved that items of personal property went missing during his hospitalization. There is also no evidence that the grievance procedures would have been a "dead end," or that BCHOC officials would likely have thwarted any attempt to grieve the issues raised in the complaint. The policy specifically allows for emergency grievances in situations where an inmate is facing an immediate threat to his safety or welfare.

Because there is no evidence in the record that Langlois filed a grievance about the issues raised in his complaint, or that the grievance policy was not an "available" administrative remedy, defendants are entitled to summary judgment on exhaustion grounds.

Although not necessary to reach defendants' arguments for summary judgment on the §1983 and IIED claims, the Court nevertheless concludes that, even if the claims were not barred by the PLRA, defendant Hodgson would be entitled to judgment as a matter of law.

### B. Claim for Failure to Protect under Section 1983 (Count One)

Count One asserts a claim under 42 U.S.C. § 1983, alleging that defendants violated Langlois's rights under the Eighth and Fourteenth Amendments by failing to protect him from harm.

Under the Eighth Amendment, "'prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners.'" *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)

(quoting *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988)). "However, not every injury suffered by a prisoner at the hands of a fellow inmate gives rise to an Eighth Amendment claim." *Giroux v. Somerset County*, 178 F.3d 28, 32 (1st Cir. 1999). In order to state a claim for the violation of Eighth Amendment rights, two requirements must be met. *Id.* First, "'the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.'" *Id.* (quoting *Farmer*, 511 U.S. at 834). Under the circumstances, there is no real question that the first requirement is met. Second, "the official involved must have had 'a sufficiently culpable state of mind,' described as 'deliberate indifference' to inmate health or safety." *Id.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 299 (1991)). Thus, "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

To satisfy the "deliberate indifference" standard, a plaintiff must produce evidence specific to each individual defendant. "[T]here is no respondeat superior liability under section 1983." *Ayala-Rodriguez v. Rullan*, 511 F.3d 232, 236 (1st Cir. 2007) (citing *Rizzo v. Goode*, 423 U.S. 362, 375–77 (1976)). "Absent evidence of participation, concerted action, or at least culpable knowledge, one officer cannot be held jointly liable under section 1983 for another officer's [unconstitutional conduct]." *Calvi v. Knox County*, 470 F.3d 422, 429 (1st Cir. 2006).

Here, Langlois has not satisfied this standard as to defendant Thomas Hodgson. Hodgson is the Sheriff of Bristol County. (Ds' SUMF ¶ 6; Dirks Aff. Ex. 3 at No. 2). He had no knowledge of either Langlois or Pacheco prior to the attack. (Ds' SUMF ¶ 24; Ex. 3 at No. 10).

11

Langlois never spoke to him or sent him any letters. (Ds' SUMF ¶¶ 20–24; Dirks Aff. Ex. 1 at 86, 88; Ex. 3 at No. 10). Because there is no evidence that Hodgson had even heard of him prior to the October 21, 2013 assault, much less that he was aware of any reported threats to his safety, there is no basis for any claim against him under § 1983 for failure to protect. *See Burrell v. Hampshire County*, 307 F.3d 1, 7 n.4 (1st Cir. 2002).[3]

### B. <u>Intentional Infliction of Emotional Distress (Count Six)</u>

The complaint also asserts a state-law claim for intentional infliction of emotional distress. To state a claim for IIED under Massachusetts law, a complaint must allege:

> (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous, was beyond all possible bounds of decency[,] and was utterly intolerable in a civilized community; (3) that the actions of the defendant were the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe and of a nature that no reasonable [person] could be expected to endure it.

*Agis v. Howard Johnson Co.*, 371 Mass. 140, 144–45 (1976) (citations and internal quotation marks omitted); *accord Brown v. Hearst Corp.*, 54 F.3d 21, 27 (1st Cir. 1995).

Defendants concede that Langlois suffered severe emotional distress as a result of the stabbing, but they contend that there is no factual basis on which to prove the first three elements of the IIED claim against them. With respect to Hodgson, the Court agrees that the IIED claim

---

[3] There is also considerable doubt as to whether that standard has been satisfied as to defendant Nicholas Drinkwine. Drinkwine was a sergeant in the BCHOC Special Investigations Unit in 2013. (Ds' SUMF ¶ 7; Dirks Aff. Ex. 4 at No. 2; Drinkwine Aff. ¶ 1). Langlois testified that he wrote his October 2013 letter about a knife in his unit, which he sent the week prior to the October 21 assault, to Drinkwine. (Ds' SUMF ¶ 25; Dirks Aff. Ex. 1 at 70; Ex. 8 at Nos. 5 and 6). However, the letter itself is addressed to Superintendent Sousa, not Drinkwine. (Dirks Aff. Ex. 7). Although the letter does mention Drinkwine, it merely says that Langlois "will continue to help Taber and Drinkwine [as an informant]" if he receives help resolving his disciplinary issue. (*Id.*) Drinkwine testified that he never saw or received a copy of the October 2013 letter. (Ds' SUMF ¶ 27; Drinkwine Aff. ¶¶ 3–4). He further testified that, prior to the attack, he never had any meetings or communications with Langlois, written or oral, about Pacheco or a risk to his safety. (Ds' SUMF ¶¶ 28–30; Dirks Aff. Ex. 4 at Nos. 3, 5, 7; Drinkwine Aff. ¶¶ 5–8). Moreover, Drinkwine left for parental leave on October 11, 2013, ten days before the assault occurred, and did not return until the following month. (Ds' SUMF ¶ 31; Dirks Aff. Ex. 9; Drinkwine Aff. ¶ 8).

must fail. Because there is no evidence that Hodgson knew of any reported threat to Langlois's safety before the assault, he could not have intended to inflict emotional distress, nor could he be said to have caused his distress.

## IV. Conclusion

For the foregoing reasons, the motion for summary judgment of defendants Thomas Hodgson, Nicholas Drinkwine, and Glen Taber is GRANTED.

**So Ordered.**

Dated: November 27, 2018

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
United States District Judge